IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DARRYL PIERRIE HALL,             )
                                 )
          Petitioner,            )
                                 )
     v.                          )     CASE NO. 2:04-CV-301-WKW [WO]
                                 )
WILLIE THOMAS, *Warden*,         )
 *et al.*,                       )
                                 )
          Respondents.           )

## MEMORANDUM OPINION AND ORDER

Before the court is the Recommendation of the Magistrate Judge (Recommendation (Doc. # 13)) that Petitioner Darryl Pierrie Hall's ("Hall") request for habeas corpus relief under 28 U.S.C. § 2254 be denied and the case be dismissed. Hall objects to the recommendation. (Objections (Doc. # 14).) The portions of a recommendation to which a defendant objects are reviewed *de novo*. 28 U.S.C. § 636(b)(1).

Hall is serving a term of life imprisonment for robbery, and a concurrent twenty-year term for kidnaping. Hall committed these crimes when he was fifteen years old. The convictions stem from his ancillary participation in a robbery carried out by Alonzo Leak ("Leak"), who pled guilty and testified against Hall. Leak entered a day care center after hours, held up three adults and had them bind each other, robbed the center, sexually abused one adult, and raped another who entered the center while the robbery was in progress.

These crimes of senseless violence, and the apparent flippancy with which they were committed, bring this case into sobering focus. Of some concern, however, is the troubling

way in which Hall was convicted.  Several features of his trial raise red flags about its fairness and his guilt: the manner in which he was apprehended and in which he confessed, the fact that two mistrials preceded his conviction, his acquittal on some of the charges, and the arguably meritorious motion for new trial that was denied.

District courts are bound, nevertheless, by statutes, case law, and legal principles such as comity that dictate the appropriate manner for handling a challenge to a state-court conviction.  Section 2254 habeas petitions must be viewed through the lens of the appropriate standard of review, and that review limits, for valid policy reasons, the relief district courts may provide state-court petitioners who arguably received an unfair shake in the state system.  That review becomes particularly burdensome to a petitioner when the errors are not reducible to discrete and glaring mistakes.  Thus, for the reasons explained below, this petition must be denied, and the recommendation's outcome is due to be adopted, but the unique difficulties of this case justify a thorough explanation for this outcome.

## I. JURISDICTION

Jurisdiction is exercised pursuant to 28 U.S.C. § 2254(a).  The parties do not contest personal jurisdiction or venue, and there are allegations sufficient to support both.

## II. BACKGROUND

**A.**   **Factual Background**

In the early evening hours of October 15, 1999, Leak entered a day care center in Montgomery, Alabama, and pulled a gun on its owner.[1]  He then corralled the owner and the other adults in the building, a parent and her male friend, and herded them into a bathroom. He took them out of the bathroom in stages and had them bind each other, but placed them in various rooms in the small center.  He periodically left them unattended and would return to ask the owner for information related to items in the building.  After the victims were bound, another parent came into the center to pay her day care fees.  Leak threatened her with a gun, and she complied with his request to bind the remaining unbound victim, and then, he proceeded to rape her.  He attempted to rape the other parent as well, physically assaulting her with his hands and gun, and using others to disrobe her.  He never followed through on the rape because the victim lied and said she had a sexually transmitted disease.  The victims testified that throughout the encounter there appeared to be other accomplices in the building or that Leak spoke of other accomplices, but no one witnessed another participant.  Leak eventually left, and the victims called for help.

Law enforcement quickly identified Leak, who implicated Hall in the crimes.  Leak claimed Hall told him that committing the crimes would position Leak to join a gang, and that Hall was outside the center during the attack providing advice to him on how to carry

---

[1] The narrated facts are those distilled from a comprehensive review of the record, in particular, of the third trial of Hall.

out the crimes.  Hall's home is around the block from the day care center and he attended the center when he was younger.  At the time of the offense, Leak was seventeen years old and Hall was fifteen years old.

The police arrested Hall at his residence two days after the crime.  His parents invited the police into their home.  When Hall was summoned into the living room, the officers handcuffed him.  He was escorted to the police station and interrogated there.  Hall eventually signed waiver forms and confessed.  During the interrogation, Hall's father waited in the police station.  Officer M.L. Major ("Major") testified at the suppression hearing that when Hall was being escorted from his home, he said "he wanted his parents to come down" to the police headquarters.  (Suppression Hr'g Tr. 20, Apr. 10, 2000 (Record for state court appeal Vol. 12).)  Hall, however, testified that he said nothing to the officers as they escorted him to the police car,[2] but that it was at the police station and prior to questioning that he said, "Where is my daddy? I thought my daddy was supposed to be here when y'all are questioning me."  (Suppression Hr'g Tr. 71-72.)

According to the police officers' testimony, at the police station and prior to questioning, they read Hall his *Miranda* warnings and state-required warnings for juveniles

---

[2] He confirmed that his father asked to be present at the interrogation.  (Suppression Hr'g Tr. 71.)

subject to interrogation, after which he voluntarily waived his rights.[3]  He acknowledges signing rights forms at some point, but argues that he did not understand them.  He denies voluntarily waiving his rights, insists he continued to ask for his father, and claims that the officers physically abused him during the interrogation.  He also testified that the details of his false confession came from the details of Leak's confession that the officers read to him before he gave a statement.[4]

At trial, Hall presented an alibi defense.  He testified and called others to testify as to where he was during the Friday afternoon of the crime.  Hall claims that he picked up his sisters from school, returned home, ate dinner, and was on the telephone until a parent of a friend picked him up for a dance at school.  To defuse the alibi defense, the prosecution called representatives from the phone company to testify that it had no record of outgoing

---

[3] Alabama law guarantees additional rights for juveniles subject to interrogation, and requires the police to read additional warnings, sometimes referred to as "Super *Miranda*" warnings. Rule 11(B) of the Alabama Rules of Juvenile Procedure, which was effective at the time of Hall's arrest, lists the "[r]ights of a child before being questioned while in custody."  The interrogator must inform a juvenile of these rights before questioning him on "anything concerning the charge" for which he was arrested. *Id.* They include "the right to communicate" with the child's counsel, parent, or guardian and if he or she is not present, "if necessary, reasonable means will be provided for the child to do so." *Id.*

The Alabama Court of Criminal Appeals affirmed the trial court's denial of Hall's motion to suppress, stating that the record supported a finding that Hall was read both sets of rights and properly waived them both.  (Ala. Crim. App. Op. 5-7.)  The Alabama Supreme Court emphasized the special rules for juvenile interrogation (*see* Ala. Sup. Ct. Op. 13-19), but found more generally: "We find no reason to hold that the trial court's determination that Hall's statement was voluntary, based on the conflicting testimony of the police, on the one hand, and of Hall and his father, on the other, was contrary to the weight of the evidence" (Ala. Sup. Ct. Op. 19).  In Alabama, the voluntariness determination is a matter of law, and the trial court's decision will not be reversed "unless it is manifestly wrong or contrary to the great weight of evidence." *Parker v. Allen*, ___ F.3d ___, 2009 WL 1034804, at *17 (11th Cir. 2009).

[4] Indeed, Hall's confession is not entirely consistent with the facts to which the victims testified at trial.

telephone calls from Hall's residence that afternoon or of outgoing telephone calls from residences from which Hall claimed he received calls.

After the conviction, during a hearing for a motion for new trial,[5] it became clear that the testimony about the phone records was false, albeit not necessarily intentionally so.  The phone company's representative who testified at trial misunderstood the company's retention periods.  For customers on flat-rate plans, which was the type of plan for all relevant customers connected with this case, local outgoing phone call records were retained only for sixty days, as opposed to the eighteen months to which the representative testified.  At the time of the subpoena, the phone company records for those outgoing calls would have been erased, which would not have been the case had the records been retained for eighteen months, the length of time the representative testified to at trial.[6]

**B.   Procedural History**

The State of Alabama indicted Hall on three counts of first-degree robbery, one count of first-degree rape, one count of first-degree sexual abuse, and four counts of kidnaping.  At his first trial, in April 2000, Hall was found not guilty of first-degree rape and first-degree sexual abuse, but the jury could not reach a verdict on the remaining counts.  Hall's second trial, in December 2000, also resulted in a mistrial.  It was his third trial, in January 2001, that

---

[5] Hall's counsel for this case represented him on the motion for new trial but not at any of the three trials.

[6] Hall's counsel at trial did not independently investigate the phone records evidence but did cross-exam the representative and noted the oddity that none of the residences showed *any* local outgoing calls during the relevant time frame, and that the only records were of long-distance calls on different days.

resulted in a conviction on all of the remaining charges.  At issue in the second and third trials was the admissibility of Hall's confession.  The court held an evidentiary hearing on his motion to suppress before the second trial, and the motion was denied.  Hall's counsel, who was the same for the second and third trials, renewed the motion before the third trial, and the same judge denied it without an additional hearing.  After the conviction, the court held an evidentiary hearing on Hall's motion for new trial, a motion which was based in part on the false testimony from the phone company representative.  A juror testified at the hearing as to the unsubstantial effect the representative's testimony had on the jury's decision.  The court denied the motion.

The Alabama Court of Criminal Appeals affirmed the denial of the motion for new trial and the motion to suppress, and rejected Hall's claim that his counsel failed to adequately prepare for trial and was thus constitutionally ineffective.  The Alabama Supreme Court in an opinion issued May 9, 2003, written by Justice Houston, affirmed the convictions.  Justice Lyons wrote a specially concurring opinion, and Justices See and Johnstone dissented without opinion.  Justice Lyons concurred with the conclusion of the majority opinion but noted that he was "troubled by the fact that on two prior occasions, two separate juries were unable to find Hall guilty of the same charges, presumably in the face of the same confession and the same evidence contradicting Hall's alibi." (Ala. Sup. Ct. Op. 22 (specially concurring).)

Hall filed his § 2254 petition on March 30, 2004.  (Pet. (Doc. # 1).)  The petition submits two grounds for relief – that Hall's confession was admitted in violation of his rights under the Fifth and Fourteenth Amendments to the United States Constitution (Pet. 17-20), and that he did not have effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments (Pet. 20-24).  The State filed an answer (Answer (Doc. # 8)), to which Hall responded (Resp. (Doc. # 10)).  The recommendation and objections are before the court.

## III.  DISCUSSION

### A.    <u>Evidentiary Hearing</u>

The Recommendation concludes that no evidentiary hearing is required for this petition.  (Recommendation 3.)  If a § 2254 petition is not dismissed earlier in the proceeding, the district court "must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 [for expanding the record] to determine whether an evidentiary hearing is warranted."  Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Court.  *Townsend v. Sain*, 372 U.S. 293 (1963) provides the standard for when district courts are required to hold an evidentiary hearing.  *Blanco v. Singletary*, 943 F.2d 1477, 1506 (11th Cir. 1991) ("'The purpose of the [*Townsend*] test is to indicate the situations in which the holding of an evidentiary hearing is mandatory.'" (quoting *Townsend*, 372 U.S. at 318)); *cf.* § 2254(e)(2) (determining when evidentiary hearings are precluded but only for instances where an applicant failed to develop

the factual basis of a claim in state court); *see Williams v. Allen*, 542 F.3d 1326, 1346-47

(11th Cir. 2008) (distinguishing between *Townsend* and § 2254(e)(2)).  A federal court must

hold an evidentiary hearing if:

> "(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing."

*Williams*, 542 F.3d at1347 (quoting *Townsend*, 372 U.S. at 313).

An evidentiary hearing is not necessary.  The merits of the factual dispute surrounding

Hall's confession were resolved in the state court suppression hearing – the state judge heard

testimony from the relevant players concerning the voluntariness of Hall's confession and

on whether he sufficiently waived his *Miranda* rights.  The merits of the underlying dispute

surrounding Hall's ineffective assistance of counsel claims were also sufficiently aired at the

motion for new trial hearing.  The court's factual determinations at both hearings are

supported by the record, as discussed herein.  There is no indication that hearings were not

full and fair, as is also discussed herein, that evidence discovered since the motion for new

trial affects the outcome of each hearing, or that material facts were not adequately

developed.  The record appears to have been fully developed and nothing about the hearing

appears injudicious.  *See Williams*, 542 F.3d at 1347-48 (discussing factors).

B.      **The Standard of Review**

"A federal court may grant a habeas corpus application arising from a state-court adjudication on the merits if the state court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1415 (2009) (quoting § 2254(d)(1)). "Clearly established law" does not include law shaped by the lower courts but unrecognized by the Supreme Court, or *dicta* from the Supreme Court. *Porter v. Attorney Gen.*, 552 F.3d 1260, 1268 (11th Cir. 2008) ("If the Supreme Court 'has not broken sufficient legal ground to establish an asked-for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar.'" (quoting *Williams v. Taylor*, 529 U.S. 362, 381 (2000) (plurality op.))); *Lockner v. Andrade*, 538 U.S. 63, 71 (2003) ("Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" (quoting *Williams*, 529 U.S. at 412))); *Dombrowski v. Mingo*, 543 F.3d 1270, 1274 (11th Cir. 2008) (summarizing the law on the § 2254 standard of review).

"[A] state court decision can be 'contrary to' clearly established federal law 'if either (1) the state court applied a rule that contradicts the governing law set forth by Supreme Court case law, or (2) when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case.'" *Dombrowski*, 543

F.3d at 1274-75 (quoting *Putnam v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001)).   An "unreasonable application" of clearly established federal law occurs when a state court "'identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case . . . [or] a state court unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context.'" *Id.* at 1275 (quoting *Putnam*, 268 F.3d at 1241).   Even if in the federal court's "independent judgment," the state court's decision was incorrect, a federal court can only issue a writ if the state court's application of clearly established federal law was "objectively unreasonable." *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004) (internal quotation marks omitted).   The standard "unreasonable" is "'a substantially higher threshold'" than the standard "incorrect." *Knowles*, 129 S. Ct. at 1420 (quoting *Schiro v. Landrigan*, 550 U.S. 465, 473 (2007)).

The Petitioner has the burden of establishing his right to relief and to prove facts showing constitutional violations.   *Blankenship v. Hall*, 542 F.3d 1253, 1270 (11th Cir. 2008). Furthermore, the petitioner must rebut with clear and convincing evidence the presumption of correctness afforded to any factual issue reached by the state court, § 2254(e)(1), and only decisions based on "an unreasonable determination of the facts" can be the basis for granting a writ on factual grounds, § 2254(d)(2).   Additionally,

> [a]s the second aspect of § 2254(d) makes clear, we also defer to the
> state court's reasonable factual determinations.   Summary adjudications, as a
> rule, do not have explicit factual findings to which a court can easily defer.
> Our body of case law discussing implied findings of fact are instructive as to

the appropriate deference afforded to factual determinations in summary rulings. We have previously recognized a state court's "dispositive ruling may contain implicit findings, which, though unstated, are necessary to that ruling." *Hightower v. Terry*, 459 F.3d 1067, 1072 n.9 (11th Cir. 2006) (post-AEDPA habeas case) (citing *United States v. $242,484.00*, 389 F.3d 1149 (11th Cir. 2004) (en banc)). State court findings of fact can be inferred from its opinion and the record. *Freund v. Butterworth*, 165 F.3d 839, 859 n.30 (11th Cir. 1999) (citing *Cave v. Singletary*, 971 F.2d 1513, 1516 (11th Cir. 1992)). Moreover, implicit findings of fact are entitled to deference under § 2254(d) to the same extent as explicit findings of fact. *See Mathis v. Zant*, 975 F.2d 1493, 1495 (11th Cir. 1992); *Cunningham v. Zant*, 928 F.2d 1006, 1011 (11th Cir. 1991).

*Blankenship*, 542 F.3d at 1271-72 (noting also, however, "this Circuit's caution in *Cave* that, while state court findings of fact can be implied, 'they cannot be imagined from thin air'" (quoting *Cave*, 971 F.2d at 1516)).

## C.    Fifth Amendment Analysis

### 1.    *Details from the Record* [7]

Several witnesses testified at the suppression hearing about the details surrounding Hall's confession. Officer Major, who took Hall's confession, testified that after he had handcuffed Hall at his house, he advised Hall of why he was being arrested. Officer Major acknowledged that Hall said he wanted his parents to come down to headquarters. Officer Major gave conflicting testimony, however, on whether Hall's father asked to join them at the police station. In response to the question at the hearing of whether Hall's father said he

---

[7] All of these details are taken from the transcript of the suppression hearing unless otherwise noted. Specific transcript citations are given in appropriate instances.

wanted to be with his son there, Officer Major said, "No."[8] (Suppression Hr'g Tr. 19.) Later, however, Officer Major said, "Yes," when asked whether Hall's father told him that he wanted to be present when his son was taken to the station and questioned. (Suppression Hr'g Tr. 24.) Hall's father testified that he asked Officer Major, "[S]houldn't me as a parent or an attorney be present when y'all get ready to question [Hall]," and that Officer Major responded, "Yes." (Suppression Hr'g Tr. 43-44.)

Once at the police station, Officer Major testified that he read Hall his *Miranda* rights, both the adult and minor versions, right before interrogating him.[9] Hall signed the rights forms. Officer Major also explained that he handcuffed Hall to his desk for the safety of both of them. Hall's father was never in the interview room and never engaged with his son at the police station even though he inquired about and waited for him there. Hall's father claims that Officer Major told him when walking past him at the station, that he would be called when the questioning started, but that never happened.[10] (Suppression Hr'g Tr. 48.) Officer Major testified that had Hall asked for his father when at the police station, the officers would have allowed Hall to consult with him.

---

[8] Officer Grant, who was also involved in the visit to Hall's house and the interrogation, said that he never heard Hall's father state that he wanted to be present at the station for any questioning. (Suppression Hr'g Tr. 60.)

[9] Officer Grant stated that normally, he read *Miranda* rights as soon as a person was arrested and handcuffed. (Suppression Hr'g Tr. 58.) They waited until Hall was at the police station in this case.

[10] At one point, Hall's father recalled that Officer Major came out of the interview room complaining of a headache and told another detective that Hall was lying but that they would get it out of him. (Suppression Hr'g Tr. 49.)

Under Hall's version of events, as the police officers escorted him from his home, his father asked the officers if he could be present when they questioned his son. (Suppression Hr'g Tr. 71.)  Before the officers began questioning Hall at the station, he asked where his father was and stated that he was supposed to be here, but that they told him not to worry because his father was upstairs. (Suppression Hr'g Tr. 72.)  At that point, they handcuffed Hall to the desk, leaving one hand free, and claimed to have a tape of him but refused to play it. (Suppression Hr'g Tr. 73.)  They read Leak's statements and badgered Hall as to why he was lying. (Suppression Hr'g Tr. 74.)  Hall testified that Officer Grant kicked Hall's chair at some point, turned it around, and clamped down on Hall's arm. (Suppression Hr'g Tr. 74-75.)  At some point, Officer Grant also hit him in the mouth with a flashlight. (Suppression Hr'g Tr. 75.)  Officer Grant denied any improper police conduct.

The state court judge denied the motion to suppress at the end of the hearing without explanation but noted that he planned to read the case law carefully to confirm his ruling. (Suppression Hr'g Tr. 80.)  After the second mistrial, and prior to the third trial, Hall's counsel renewed the motion to suppress, which was denied outright "based on all the previous testimony," presumably from the suppression hearing. (Third Trial Tr. 38, Jan. 22, 2001 (Record for state court appeal Vol. 21).)[11]

_____

[11] Also of import, at the hearing for a motion for new trial, a defense witness who evaluated Hall in jail found that he tested at the level of a child in need of special education. (Mot. New Trial Hr'g Tr. 7, Apr. 25, 2001 (Record for state court appeal Vol. 25).)  The State on cross-examination challenged the basis for and implications of those findings.

2. *Waiver of Fifth Amendment Rights*

"The Fifth Amendment by its terms prevents a person from being 'compelled in any criminal case to be a witness against himself.'" *Mitchell v. United States*, 526 U.S. 314, 327 (1999) (quoting U.S. Const. amend. V).  In *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), "the Court concluded that the possibility of coercion inherent in custodial interrogation unacceptably raises the risk that a suspect's privilege against self-incrimination might be violated," and so, "[t]o protect against this danger, the *Miranda* rule creates a presumption of coercion, in the absence of specific warnings." *United States v. Patane*, 542 U.S. 630, 639 (2004) (plurality op.).  Under *Miranda*, "a suspect must be apprised of his rights against compulsory self-incrimination and to consult with an attorney before authorities may conduct custodial interrogation." *Texas v. Cobb*, 532 U.S. 162, 171 (2001) (citing *Miranda*, 384 U.S. at 479); *see also Dickerson v. United States*, 530 U.S. 428, 435 (2000).[12]  *Miranda* warnings are "prophylactic means of safeguarding Fifth Amendment rights," and alert the suspect to his "right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation." *Doyle v. Ohio*, 426 U.S. 610, 617 (1976) (citation omitted).

---

[12] The Fifth Amendment applies to the states through the Fourteenth Amendment's Due Process Clause. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964).  Additionally, as the Due Process Clause prohibits the deprivation "of life, liberty, or property, without due process of law," U.S. Const. amend. XIV, it protects against "[c]onvictions based on evidence obtained by methods that are 'so brutal and so offensive to human dignity' that they 'shoc[k] the conscience.'" *Chavez v. Martinez*, 538 U.S. 760, 774 (2003) (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952)).  Convictions based on confessions obtained by "police torture or other abuse" are thus also subject to the exclusionary rule. *Id.* at 773.

*Miranda* dictates that "the government may not use statements stemming from the custodial interrogation of a criminal defendant unless the government demonstrates that it used procedural safeguards to ensure the privilege against self-incrimination remains intact." *United States v. Beckles*, ___ F.3d ___, 2009 WL 1026365, at *4 (11th Cir. 2009). Thus, if a confession is obtained in violation of the right against self-incrimination or due process, the exclusionary rule applies to keep the confession out of the case. *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 348 (2006). The constitutional privilege is applicable to juveniles as well as adults even though "special problems may arise with respect to waiver of the privilege by or on behalf of children." *In re Gault*, 387 U.S. 1, 55 (1967).

Hall argues that the State failed to prove that he properly waived his Fifth Amendment rights and that his statement was voluntary.[13] (Pet. ¶ 80.) An individual may waive the rights the *Miranda* warnings protect "'provided the waiver is made voluntarily, knowingly, and intelligently.'" *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Miranda*, 384 U.S. at 444). The waiver must have been first, "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and second, "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*; *accord Beckles*, 2009 WL 1026365, at *4. A court should consider the "'totality of the circumstances surrounding the interrogation'" for determining whether there was "an

---

[13] A written waiver, which was obtained in this case (*see* Suppression Hr'g Tr. 76), "'is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver.'" *Beckles*, 2009 WL 1026365, at *4 (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

uncoerced choice and the requisite level of comprehension." *Moran*, 475 U.S. at 421 (quoting *Fare v. Michael C.*, 422 U.S. 707, 725 (1979)).

In *Fare*, the Court held that this totality-of-circumstances test "is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved." 442 U.S. at 725.  The Court "discern[ed] no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so." *Id.*  The Court listed factors for determining whether a minor had the capacity to understand the *Miranda* warnings, the nature of his rights, and the consequences of waiver. *Id.*  Those factors included "age, experience, education, background, and intelligence." *Id.*  At issue is the "actual mindset" of the petitioner. *Yarborough*, 541 U.S. at 667.

The Court declined to find in *Fare* that a minor's request to speak with a probation officer constituted a *per se* invocation of his right to remain silent.  422 U.S. at 723.  The Court instructed lower courts to take such a request into account in determining whether a minor *waived* his Fifth Amendment rights.  *Id.* at 724.  "Where the age and experience of a juvenile indicate that his request for his probation officer or *his parents* is, in fact, an invocation of his right to remain silent, the totality approach will allow the court the necessary flexibility to take this into account in making a waiver determination." *Id.* at 725 (emphasis added).  By this holding, the Court explicitly declined to "impos[e] rigid restraints" on police and courts if factors indicate the juvenile was fully aware of his rights

and what waiver would mean, and had voluntarily waived his rights. *Id.* at 725-26. The Court highlighted the following factors in finding that the suspect had in fact waived his Fifth Amendment rights: (1) the transcript of the interrogation showed the police officers took care to ensure the minor understood his rights; (2) there was no indication in the record that the minor failed to understand what the officers told him; (3) the minor "clearly expressed his willingness to waive his rights and continue the interrogation"; (4) there were no "special factors," like age or experience, indicating that the minor could not understand his rights; and (5) the minor was "not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit." *Id.* at 726-27.

In *Henyard v. McDonough*, 459 F.3d 1217 (11th Cir. 2006) (per curiam), the Eleventh Circuit considered whether a state-court's determination that a confession was voluntary was contrary to or an unreasonable application of clearly established federal law.[14] *Id.* at 1240-41. The court declined to find that the minor's inquiries to the police of how long the interrogation would continue and the request for his aunt at a polygraph test were invocations of the right against self-incrimination. *Id.* at 1240. The court noted also that the police officers read the minor his rights twice, that he twice waived them, and that at no time after those rights did the minor "express[] even an ambiguous desire to end the questioning." *Id.* at 1241. The court considered the following factors to determine that his confession was

---

[14] Although only Supreme Court law is federal law that is clearly established, the Supreme Court has highlighted the application of law by lower federal courts when determining whether a state-court's application was objectively unreasonable. *See Price v. Vincent*, 538 U.S. 634, 643 & n.2 (2003).

18

voluntary: (1) the rights were explained to the minor twice; (2) his intelligence, though below average, was not so low that he could not understand those rights; (3) the transcript of the interrogation and responses gave no indication that he was confused or that he misunderstood the seriousness of the interrogation; (4) the police engaged in no trickery, deception, or improper interrogation tactics; and (5) the minor had prior experience with the justice system. *Id.*

### a.   *Unreasonable Application of Clearly Established Federal Law*

In considering Hall's waiver and whether the confession was voluntary, the state courts did not apply a standard contrary to clearly established federal law.  Although an individual in custody can invoke his Fifth Amendment rights when interrogation is imminent under Eleventh Circuit law, *see United States v. Grimes*, 142 F.3d 1342, 1348 (1998), and there is testimony that Hall asked for his parents when he was in custody and interrogation was imminent, there is no clearly established federal Supreme Court law that a minor's request for his parents is a *per se* invocation of his Fifth Amendment rights.  The request only factors into the totality-of-the circumstances waiver analysis.  The state courts in this case took age and other related factors into account in their waiver analysis.  The proper analysis is whether the state court unreasonably applied clearly established law.

### b.      *Analysis*

Whether a suspect in custody was informed of his *Miranda* rights is a question of fact,[15] but whether the suspect knowingly and intelligently waived his rights and whether his statements were voluntary are questions of law.  *Mincey v. Head*, 206 F.3d 1106, 1131 (11th Cir. 2000); *Miller v. Fenton*, 474 U.S. 104, 115 (1985) (stating that whether a confession is voluntary under the Fourteenth Amendment is a question of law and a state-court's finding of fact is not entitled to a presumption of correctness); *Thompson v. Keohane*, 516 U.S. 99, 111 (1995) (assessing the predecessor of § 2254(e)(1)).  Although questions of credibility may contribute to the finding of historical fact,[16] the ultimate assessment of voluntariness is not a question of fact.  *Thompson*, 516 U.S. at 113.

If a state trial court made no explicit findings of fact, or the findings of fact are not comprehensive, the federal district court can discern the evidence that was available to the state courts and determine whether the application of the voluntariness standard was reasonable.  *See Blankenship*, 542 F.3d at 1272 n.5.  In its order on Hall's motion for new trial, the state court commented on its earlier ruling to deny Hall's motion to suppress:

---

[15] State court findings of historical fact are subject to a presumption of correctness.  § 2254(e)(1).

[16] "[S]ubsidiary questions, such as length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the *Miranda* warnings, often require the resolution of conflicting testimony of police and defendant.  The law is therefore clear that state-court findings on such matters are conclusive on the habeas court if fairly supported in the record . . . . But once such underlying factual issues have been resolved, and the moment comes for determining whether, under the totality of the circumstances, the confession was obtained in a manner consistent with the Constitution, the state-court judge is not in an appreciably better position than the federal habeas court to make that determination."  *Miller*, 474 U.S. at 117.

> The issue of the lack of voluntariness of the statement was raised and a lengthy hearing was conducted on the defendant's Motion to Suppress.
>
> . . . .
>
> Matters of the defendant's intelligence and age were considered fully at the hearing on the motion to suppress and throughout each of the trials. While an accused's intelligence and literacy are important factors to be considered in determining whether he intelligently and voluntarily waived his constitutional rights and made a confession, weak intellect or illiteracy alone will not render a confession inadmissible.

(Apr. 30, 2001 Order 1, 4 (Record for state court appeal Vol. 11).)  Given its ruling on the suppression motion, the state court impliedly found as matters of fact that the officers read Hall his rights, and that he was not physically or emotionally abused by the police to secure his waiver and confession.

The record supports an implicit finding that there was no abuse, and there is no clear and convincing evidence to the contrary.  The record also supports the state court's finding that Hall was informed of his rights but did not, at least explicitly, invoke them.  Even if he had asked for his parents after the *Miranda* warnings, however, that is not a *per se* invocation of silence or the desire for counsel.  The question on review, therefore, is whether Hall properly waived those rights and whether his confession was voluntary, knowing, and intelligent.  Tipping the balance toward a valid waiver and subsequent voluntary statements are the rights forms he signed, a recording of the confession, the lack of testimony that the police officers were abusive in any way when they came to arrest Hall, his relative independence as a child, and the lack of testimony that the officers committed violations in the past.  The detail most strongly undermining a proper waiver, however, is the fact that the

21

police officers knowingly severed contact between Hall and his father. *Cf. Paxton v. Jarvis*, 735 F.2d 306, 1309-10 (11th Cir. 1984) (finding state court findings of lack of physical abuse entitled to deference and supported by the record, and also finding the confession was voluntary based on the fact the petitioner was sixteen, members of petitioner's family had ample contact with him at the police station, petitioner was told of the charges and given *Miranda* warnings, and the questioning was neither continuous nor conducted by threats or beatings); *Rogers v. Quarterman*, 555 F.3d 483, 493-94 (5th Cir. 2009) (finding it significant that the officers testified that the minor in custody did not request his mother or attorney at any point and that the state court found the officers' testimony credible, noting that the minor's testimony was inconsistent and that his mother's testimony did not affirm he asked for her such that the officers could hear his request).

In a recent opinion, the Fifth Circuit analyzed the voluntariness of a juvenile's confession as part of an ineffective assistance of counsel claim. *Rogers*, 555 F.3d at 490-96. The court found that although the petitioner, who was a juvenile suspect, "had no experience with the criminal justice system and was unaccompanied during the interrogation[,] . . . indicat[ing] [petitioner] may have been vulnerable to coercion," his waiver and confession were voluntary. *Id.* at 494. He "was not continuously or lengthily interrogated," he was detained only for hours, not days, he was continuously apprised of his rights, and the record indicated he understood those rights even if he functioned at a younger age intellectually. *Id.* at 495. "Most significantly," the court stated, "[petitioner] was not subjected to physical

abuse, mental coercion, trickery, or deceit[,]"[17] and the officers were "truthful" as to other corroborating evidence and there was no other evidence that the officers "somehow induced" the confession. *Id.*   As the court observed, "[c]ases which have found a juvenile's confession involuntary often include some form of mental coercion, denial of rights, intimidation, threats or physical abuse in obtaining the confession." *Id.* at 494.

Those factors are not present.  Hall's confession was voluntary, and he waived his rights voluntarily, knowingly, and intelligently.  Although his lack of experience in the criminal system, his allegedly weaker intellectual capabilities, and his awareness that his father wanted to be present at the interrogation[18] undermine his waiver and confession, other factors more strongly support upholding the state courts' conclusions.  Hall was fifteen, not a young child, and he could read, and could function independently – walking to and from school, taking care of his sister, taking care of his needs at home.  He was socially adept, and according to his own testimony, fielded phone calls from numerous friends and attended social school functions.  He admits that he did not ask for his parents' assistance when the police were at his residence, and he accompanied the police without incident to the police

---

[17] The court distinguished its circumstances from those in *Haley v. State of Ohio*, 332 U.S. 596 (1948), where the Court found a confession violated the Fourteenth Amendment protections of due process because the suspect was a minor who was "grilled" after midnight for many hours, without friend or counsel, and because of the "callous attitude of the police towards his rights," *id.* at 598-601.  *Rogers*, F.3d at 495.

[18] Hall's claim that he asked for his father at the police station conflicts with the police officers' claim to the contrary, but the state court evidently believed the police, finding he did not invoke his state-law right to consult with a parent, and that credibility determination is entitled to a presumption of correctness that Hall has not overcome.

station.  The record reflects no history of serious problems with authority or with following directions at school or at home.  Finally, and importantly, there is a written waiver of his rights and testimony that he was read them multiple times.  His statement followed an interrogation that was not lengthy.  The state court determined, based on the credibility of the testimony, that there was otherwise no abuse.

Even if this court were to find, however, that based on an independent review of the record, Hall's confession was involuntary or that he did not adequately waive his rights, the state court's incorrect finding would not have been an *unreasonable* one.  "The term 'unreasonable' is 'a common term in the legal world and, accordingly, federal judges are familiar with its meaning.'"  *Yarborough*, 541 U.S. at 663-64 (quoting *Williams*, 529 U.S. at 410).  The "range of reasonable judgment" depends on the "nature" of the applied rule:

> Applications of the rule may be plainly correct or incorrect.  Other rules are more general, and their meaning must emerge in an application over the course of time.  Applying a general standard to a specific case can demand a substantial element of judgment.  As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity.  *The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations*.

*Id.* at 644 (emphasis added).

Reasonable factfinders could disagree as to whether Hall's confession was voluntary.  *See Yarborough*, 541 U.S. at 644 (using the "fairminded" jurist language).  Hall's testimony throughout the trial was not entirely consistent, and even during the suppression hearing, his claims of being hit in the mouth with a flashlight and that he wanted his father could be

24

deemed less credible in view of the inconsistencies in his testimony and that of the alibi witnesses. It was his word against that of police officers in the field, and a judicial observer of their testimony could distinguish between the two most effectively. Additionally, the evidence of Hall's diminished intellectual capacity, presented at the hearing for the motion for new trial, was not so conclusive and airtight as to disqualify the state court's assessment that the waiver was valid. A reasonable factfinder could instead believe Hall and his father, and find that the police created an environment where the psychological coercion jeopardized the authenticity of the confession. This equipoise in evidence is an indication that the state court did not *unreasonably* determine that Hall's waiver was voluntary when he confessed to the officers.

## D.   <u>Sixth Amendment Analysis</u>

"[T]he Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial." *Strickland v. Washington*, 466 U.S. 668, 684 (1984). *Strickland* requires a defendant to establish deficient performance and prejudice to prevail on an ineffective assistance of counsel claim. *Knowles*, 129 S. Ct. at 1420. To prove deficient performance, a petitioner must show:

> that counsel's representation fell below an objective standard of reasonableness. The proper measure of attorney performance remains simply reasonableness under prevailing professional norms. Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.

25

*Id.* (internal quotation marks and citations omitted).  "To establish prejudice, '[t]he [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"  *Id.* at 1422 (quoting *Strickland*, 466 U.S. at 691).  The determination of counsel's effectiveness is a question of law.  *Thompson*, 516 U.S. at 111 (citing *Strickland*, 466 U.S. at 698).

Hall raised an ineffective assistance of counsel claim on his motion for new trial.  In response, the state trial court reached the following findings: (1) witnesses from the school not called for the alibi defense would have been cumulative in light of records proving Hall's attendance at school, and their testimony was not pertinent to any material issue considering the crimes occurred after school hours;[19] (2) additional witnesses for the alibi defense would have been cumulative; and (3) in response to Hall's claim that his counsel was inexperienced, overworked and unprepared, Hall's attorney had a continuance for several months before she took over the defense, and her representation during the second trial yielded a mistrial.  (Apr. 30, 2001 Order 1-2.)  The state court on appeal identified the ineffective assistance of counsel claims as failing "to secure funds for a private investigator, to obtain information about [Hall's] mental ability, to speak with alibi witnesses, to contact anyone from [the phone company], and to call character witnesses."  (Ala. Crim. App. Op. 7.)  These are the claims now before the court.  (Pet. ¶¶ 86-88.)

---

[19] There was conflicting testimony on whether Hall and Leak conspired before school to commit crimes.

The Alabama Court of Criminal Appeals affirmed the trial court's finding (Ala. Crim. App. Op. 7), as did the Alabama Supreme Court (Ala. Sup. Ct. Op. 13).  The supreme court focused on one issue, which covered *Strickland*'s application to counsel's alleged failure to conduct due diligence with respect to the phone records.  (Ala. Sup. Ct. Op. 12.)  The court resolved the issue by finding no prejudice on the basis that accurate testimony on the phone records would not have altered the outcome of the trial.  (Ala. Sup. Ct. Op. 12.)  The state courts did not unreasonably apply the standard for ineffective assistance of counsel by finding that counsel's failure to obtain funds for experts, to obtain information about Hall's mental ability, to speak to witnesses, or to call character witnesses, did not satisfy the *Strickland* standard.  "Failure to conduct a pretrial investigation and interview witnesses is not a per se sixth amendment violation." *Code v. Montgomery*, 799 F.2d 1481, 1484 (11th Cir. 1986).  A counsel's decision to not investigate "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.  Also, the question of deficient performance "'is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" *Payne v. Allen*, 539 F.3d 1297, 1315 (11th Cir. 2008) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).

Hall has not explained how counsel's decision not to procure funds for investigators or experts was deficient, let alone how it would have changed the outcome of his case. As for the expert's testimony concerning Hall's mental capacities, although those conclusions

may have been "beneficial" to his suppression hearing and trial (Pet. ¶ 87), that does not conclusively establish that there was a reasonable probability the proceedings would have resulted in a different outcome.  In the expert's opinion, Hall "would have a difficult time understanding directions and understanding the consequences of directions," and "he did not have the intellectual ability to mastermind or be the leader of any type of crime or to orchestrate the type of crime charged." (Pet. ¶ 87.)  As the trial court pointed out, however, Hall's ability to understand and assess his rights surfaced and was aired during the suppression hearing, and the jury was able to assess Hall's demeanor on the stand and reach a decision on crediting Hall's confession.[20]  Also, the State's cross-examination of the expert at the motion hearing highlighted how the State could have undermined the mental capacity testimony at trial and the potential weaknesses in the expert's testimony and conclusions. Thus, even if counsel was deficient in not exploring Hall's mental capacity, Hall has not shown how that failure was prejudicial.  Finally, as to the potential alibi witnesses and the witnesses not called to the stand, the trial court's finding that the alibi witnesses would have been cumulative is not an unreasonable application of the *Strickland* standard,[21] and Hall has not shown how the failure to call character witnesses was prejudicial.  "The test for

---

[20] Hall testified at the trial as to his alibi defense and his allegedly coerced confession.

[21] *Cf. Code*, 799 F.2d at 1483-84 (finding a deficient investigation and thus, ineffective assistance of counsel where counsel interviewed only one defense witness (and was not sure whether he interviewed the prosecution's witnesses) and failed to develop that defense with the witness or subpoena her for trial in a case where the alibi defense was all that was available and was not introduced or explored *at all*).

reasonableness is not whether counsel could have done something more or different . . . ."
*Payne*, 539 F.3d at 1317.

Counsel's failure to interview anyone from the phone company or to investigate the outgoing call records (Pet. ¶ 88), however, is of more noteworthy concern.  But in considering whether the jury would have reached a different verdict without the phone representative's testimony, the Alabama Supreme Court agreed with the trial court:  "The telephone records, like the other evidence, merely presented a conflict the jury was required to resolve in assessing Hall's guilt."[22]  (Ala. Sup. Ct. Op. 8.)  The court denied the ineffective assistance of counsel claim based on the absence of prejudice.

The state courts' denial of Hall's Sixth Amendment claim was not an unreasonable application of *Strickland*.  First, as the state courts intimated, the testimony on the phone records was at least undermined by the questions defense counsel raised on cross-examination during the trial.  In response to the phone company representative's testimony that the relevant residences showed no record of outgoing local calls on October 15, 1999, Hall's counsel asked:

> So all of these people would have active service, and nobody made a phone call at all?
> . . . .
> From twelve o'clock a.m. to – or twelve o'clock midnight, that's when October 15th would start, until 11:59 that night, nobody picked up their phone from any of those residences and made a phone call? Is that what you're saying?

---

[22] The supreme court's finding, though analyzed under a different claim (Ala. Sup. Ct. Op. 7), was the basis for the finding of no prejudice under *Strickland* (Ala. Sup. Ct. Op. 12).

(Third Trial Tr. 693.)  The representative responded that the *data* showed no phone calls on

those dates.  On re-cross, Hall's counsel highlighted, and the representative confirmed, that

the only phone calls recorded for those residences were long distance calls, which were on

different dates.  (Third Trial Tr. 696.)  The inference from this questioning is that something

could have been wrong with the phone records, for to believe otherwise was to assume that

multiple people in different houses made only long distance phone calls on the surrounding

dates, and no local phone calls on those dates, and that everyone testifying to making local

calls was lying.  The groundwork for that inference was before the jury.[23]

    It is hard to argue that the alibi defense was not weakened to some degree by the

absence of phone records proving outgoing phone calls, but other evidence, supporting Hall's

commission of the crime, shores up the conviction.  Countering the alibi defense was Hall's

---

    [23] This point also goes to counsel's performance.  Counsel arguably could have preempted this confusion by investigating the phone records, but "[i]n applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made," *Rompilla v. Beard*, 545 U.S. 374, 361 (2005) (quoting *Strickland*, 466 U.S. at 689).  Counsel's error seems less egregious considering the nature of the surrounding testimony, her cross-examination, and the reputation and incentives of the phone company.  A disinterested phone company representative has no obvious incentive to lie or testify inaccurately about a feature as routine as retention policies.  Moreover, "if an omission [by counsel] is inadvertent, relief is not automatic.  The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."  *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam).  "[C]ourts must recognize that counsel does not enjoy the benefit of unlimited time and resources."  *Chandler v. United States*, 218 F.3d 1305, 1314 n.14 (2000) (en banc).  *Cf. Holsomback v. White*, 133 F.3d 1382, 1386-88 (11th Cir. 1998) (finding ineffective assistance of counsel where counsel failed to ascertain *with any interviews, records, or witnesses*, the lack of medical evidence that would have supported his client).  Finally, it is unclear how interviewing the phone company representative or obtaining the phone records would have unearthed the mistake.  The mistake was based on facts discoverable *outside* of those sources, *i.e.*, through other representatives.  In essence then, Hall expected his counsel not only to test the representative's truthfulness and credentials, but also to obtain a second opinion on those findings.  *Cf. id*. (addressing medical evidence, for which obtaining second opinions has more of an obvious utility because reaching medical decisions necessarily entails a series of high-level judgments).

confession and Leak's testimony.  Indeed, even if Hall had made some or all of the phone calls the alibi testimony supported, that does not seal his defense into an airtight refutation of the charges against him.  Hall lived close to the center.  Hall did not show that absent the faulty phone record testimony, there would have been no break in the phone calls, or that Hall could not have left the phone off the hook, especially during a multi-party call, and walked to the nearby center for a quarter-hour.  Furthermore, inconsistencies in the testimony from the alibi witnesses undermined their credibility.  Although phone records would have presented unobjectionable proof that phone calls were made, what Hall did during any gap in time or as phone calls transpired would have remained unresolved and before the jury.  The state court therefore was not unreasonable in finding no prejudice to Hall for his counsel's performance with respect to the phone company records.

Accordingly, Hall's ineffective assistance ground for relief must also be denied.

## IV.  CONCLUSION

Despite some reservation, the court is compelled by issues of comity and the specific language of AEDPA to deny this petition for habeas corpus.  Accordingly, it is ORDERED that:

(1)    Hall's objections (Doc. # 14) are OVERRULED;

(2)    The Recommendation (Doc. # 13) is ADOPTED for its outcome; and

(3)    Hall's petition for habeas relief under 28 U.S.C. § 2254 (Doc. # 1) is DENIED and this case is DISMISSED with prejudice.  An appropriate judgment will be entered.

31

DONE this 15th day of May 2009.

                    /s/  W. Keith Watkins
                    UNITED STATES DISTRICT JUDGE